# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 23-10395

JANTZEN VERASTIQUE; DONDI MORSE; PARKER NEVILLS;
YOLANDA DOBBINS; DAVID BAKER, also known as DABI BAKER;
MAGGIE LITTLE,

*Plaintiffs-Appellants,*

v.

THE CITY OF DALLAS, TEXAS; DALLAS COUNTY; DALLAS
COUNTY SHERIFF'S OFFICE,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, DALLAS, IN NO. 3-22-CV-1182,
HONORABLE SAM R. CUMMINGS, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLANTS

JENNIFER JONES DESPINS
JAY D. ELLWANGER
ELLWANGER HENDERSON, L.L.L.P.
11149 Research Blvd., Ste. 100
Austin, Texas 78759

(737) 202-2986

– and –

DAVID HENDERSON
ELLWANGER HENDERSON, L.L.L.P.
400 South Zang Blvd. Ste. 600
Dallas, Texas 75208
(737) 202-2986

*Attorneys for Plaintiffs-Appellants*

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Jantzen Verastique

Dondi Morse

Parker Nevills

Yolanda Dobbins

Dabi Baker

Maggie Little

David Henderson

Jay D. Ellwanger

Jennifer Jones Despins

J. Sebastian Van Coevorden

Dallas County Sherriff's Office

Dallas County

The City of Dallas

John Creuzot

Barbara S. Nicholas

Jason G. Schuette

J. Cheves Ligon

*/s/ David W. Henderson*
David W. Henderson

## **STATEMENT REGARDING ORAL ARGUMENT**

The issues forming the basis of this lawsuit are important and factually intensive. Plaintiffs respectfully suggest that the Court would benefit from hearing counsel explain the details of these important issues in the Fifth Circuit. Plaintiffs believe that further explanation beyond that contained in the written arguments would be beneficial to the Court. Plaintiffs seek a reversal of the trial court based upon the application of the law to the facts in this case, and it is an understanding of the nuances in the facts of this matter that oral argument would benefit.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES ................................................................................. iv

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES PRESENTED ......................................................3

STATEMENT OF THE CASE ..............................................................................4

   A. Procedural History ...........................................................................4

   B. Statement of Facts ............................................................................5

SUMMARY OF THE ARGUMENT ...................................................................13

ARGUMENT .....................................................................................................15

   A. Applicable Legal Standards............................................................15

   B. The District Court Wrongfully Ignored Plaintiffs' Specifically Pleaded Allegations that the DPD Chief was the Delegated Policymaker for the Policies and Practices of the DPD .................................................................18

   C. The District Court Erred in Disregarding Plaintiffs' Argument that the City Defendant's Mass Arrest Policy was Unconstitutional on its Face Thus Sufficiently Alleging *Monell* Liability ..................................................30

   D. The District Court Erroneously Ignored Plaintiffs' Argument that the City's Inadequate Disciplinary Policy is Sufficient to Allege Municipal Liability at the Dismissal Stage ...................................................35

CONCLUSION ..................................................................................................38

# TABLE OF AUTHORITIES

**Cases**

*Backe v. City of Galveston,*
  *Tex.*, 2 F.Supp.3d 988 (S.D. Tex. 2014) .........................................................28

*Barham v. Ramsey,*
  338 F. Supp. 2d 48 (D.D.C. 2004)...................................................................34

*Barnett v. City of Plainview,*
  848 S.W.2d 334 (Tex. App.—Amarillo 1993, no pet.) ...................................21

*Bennett v. City of Slidell,*
  728 F.2d 762 (5th Cir. 1984) ..................................................................... 19, 20

*Burge v. St. Tammany Par.,*
  336 F.3d 363 (5th Cir. 2003) ...........................................................................31

*Carmona v. City of Dallas,*
  2020 WL 2812859 (N.D. Tex. May 28, 2020) .................................................16

*City of Clinton v. Pilgrim's Pride Corp.,*
  632 F.3d 148 (5th Cir. 2010) ...........................................................................16

*Colson v. Groman,*
  174 F.3d 498 (5th Cir. 1999) ...........................................................................34

*Covington v. City of Madisonville, Tex.,*
  812 Fed.Appx. 219 (5th Cir. 2020)...................................................................31

*Dalfrey v. Boss Hoss Cycles, Inc.,*
  456 Fed. Appx. 329 (5th Cir. 2011)..................................................................15

*ESI/Employee Solutions, L.P. v. City of Dallas,*
  531 F.Supp.3d 1181 (E.D. Tex. 2021)..............................................................21

*Evett v. DETNFF*,
    330 F.3d 681 (5th Cir. 2003) ...........................................................33

*Garza v. City of Donna*,
    922 F.3d 626 (5th Cir. 2019) ..........................................................29

*Hobart v. Estrada*,
    582 F. App'x 348 (5th Cir. 2014) ...................................................27

*Hughes v. City of Dallas*,
    2020 WL 4670659 (N.D. Tex. Aug. 11, 2020) .............................16

*Jackson v. Valdez*,
    852 Fed. Appx. 129 (5th Cir. 2021) (per curiam), cert. denied,
    —— U.S. ——, 142 S.Ct. 863, 211 (2022) .....................................18

*Jauch v. Choctaw Cty.*,
    874 F.3d 425 (5th Cir. 2017) ..........................................................35

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 ...................................................................................19

*Johnson v. Rosenberg Police Dep't*,
    2019 WL 3892331 (S.D. Tex. 2019) .............................................21

*Johnson v. City of Shelby, Miss.*,
    574 U.S. 10 (2014) .........................................................................16

*Johnson v. Thibodaux City*,
    887 F.3d 726 (5th Cir. 2018) ..........................................................33

*Keenan v. Tejda*,
    290 F.3d 252 (5th Cir. 2002) ..........................................................34

*Leatherman v. Tarrant Cty Narcotics Intelligence & Coordination Unit*,
    507 U.S.163, 113 S.Ct. 1160 (1993)..............................................16

*Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*,
  942 F.3d 258 (5th Cir. 2019) ...........................................................25

*Maddux v. Officer One*,
  90 Fed.Appx. 754 (5th Cir. 2004)............................................. 31, 32

*Mills v Brown*,
  316 S.W.2d 720 (Tex. 1994) ...........................................................23

*Monell v. Dep't of Social Servs.*,
  436 U.S. 658 (1978).........................................................................17

*Monsanto Co. v. Cornerstones Municipal Util. Dist.*,
  865 S.W.2d 937 (Tex.1993) ...........................................................23

*Montoya v. FedEx Ground Package Sys., Inc.*,
  614 F.3d 145 (5th Cir. 2010) ...........................................................15

*Mote v. Walthall*,
  2017 WL 2651705 (E.D. Tex. June 20, 2017) .................................28

*Overton v. City of Austin*,
  748 F.3d *941* (5th Cir. 1984) ...........................................................21

*Pena v. City of Rio Grande City*,
  879 F.3d 613 (5th Cir. 2018) ...........................................................17

*Perry v. Sindermann*,
  408 U.S. 593 (1972).........................................................................34

*Piotrowski v. City of Houston*,
  237 F.3d 567 (5th Cir. 2001) ..................................................... 18, 31

*Ramirez v. Escajeda*,
  2021 WL 3713064 (W.D. Tex. Aug. 20, 2021)................................37

*Richardson v. Axion Logistics, L.L.C.*,
    780 F.3d 304 (5th Cir. 2015) ..........................................................................15

*Robinson v. City of Garland*,
    2016 WL 7396048 (N.D. Tex. Aug. 17, 2016) .................................................28

*Robinson v. Hunt Cnty., Tex.*,
    921 F.3d 440 (5th Cir. 2019) ..........................................................................24

*Sanzhez v. Gomez*,
    2020 WL 1036046 (W.D. Tex. Mar. 3, 2020).................................................32

*Sorokolit v. Rhodes*,
    889 S.W.2d 239 (Tex. 1994) ..........................................................................23

*Turner v. Upton County, Tex.*,
    915 F.2d 133 (5th Cir. 1990) ..........................................................................24

*U.S. v. Bollinger Shipyards, Inc.*,
    775 F.3d 255 (5th Cir. 2014) ..........................................................................16

*Valle v. City of Houston*,
    613 F.3d 536 (5th Cir. 2010) ..........................................................................17

*Villegas v. City of El Paso*,
    2020 WL 981878 (W.D. Tex. Feb. 28, 2020) .................................................28

*Webb v. Town of Saint Joseph*,
    925 F.3d 209 (5th Cir. 2019) ..........................................................................20

*Ybarra v. Illinois*,
    444 U.S. 85 (1979)..........................................................................................33

Zarnow v. City of Wichita Falls, Tex.,
    614 F.3d 161 (5th Cir. 2010) ................................................................. passim

**Other Authorities**

CHARTER OF THE CITY OF WICHITA FALLS, TEX. Art. XII .......................................27

CHARTER OF THE CITY OF DALLAS, TEX. at Ch. XVIII § 2 ......................................22

CHARTER OF THE CITY OF DALLAS, TEX. Ch. XII § 2(1) ........................................27

CHARTER OF THE CITY OF DALLAS, Tex. Ch. XII § 4 ...................................... 35, 36

CHARTER OF THE CITY OF DALLAS, TEX. Ch. XVIII § 1 ..........................................22

CHARTER OF THE CITY OF DALLAS, TEX. Ch. II ............................................... 21, 22

DALLAS CITY CODE, CH. 1 ......................................................................................22

DALLAS CITY CODE, CH. 37, ART. II § 37-24 ........................................................24

TEX. CONST. art. XI .............................................................................................21

TEX. LOCAL GOV'T CODE...................................................................................... 21, 22

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants Jantzen Verastique, Dondi Morse, Parker Nevills, Yolanda Dobbins, Dabi Baker, and Maggie Little (collectively "Plaintiffs") appeal from the March 20, 2023 Order (ROA.383-ROA.384; ROA.385-ROA.387) and March 22, 2023 Amended Rule 54(b) Judgment (ROA.388) issued by the Northern District of Texas granting the Defendants' the City of Dallas ("City Defendant"), Dallas County ("County Defendant"), and the Dallas County Sheriff's Office ("Sheriff's Office") (collectively "Defendants") Motions to Dismiss. The District Court had jurisdiction pursuant to pursuant to (i) 28 U.S.C.A § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States; (ii) 28 U.S.C.A § 1343(a)(3), which confers original jurisdiction upon this Court in any civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and 28 U.S.C.A § 1343(a)(4), which confers original jurisdiction upon this Court in any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

Plaintiffs timely filed a Notice of Appeal, dated April 14, 2023, that was entered by the Court on April 14, 2023. (ROA.391-ROA.392). This Court has jurisdiction over this appeal under 29 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

1.  Did the District Court commit reversible error when it limited its holding to finding that the City Council was the official policymaker for the City Defendant, wrongfully disregarding Plaintiffs' allegations that the City Council delegated policy making authority to the DPD Chief specifically on policing policies?

2.  Did the District Court err when it ignored Plaintiffs' allegations that the City Defendant's written policy was plausibly unconstitutional as written?

3.  Did the District Court err when it granted Defendants' motion for dismissal ignoring that the City Defendant maintained an inadequate disciplinary policy which was the moving force behind the violation of Plaintiffs' constitutional rights causing Plaintiffs injury?

# STATEMENT OF THE CASE

### A.     Procedural History

On May 31, 2022, Plaintiffs filed suit against Defendants for violations of 42 U.S.C.A § 1983, including for (i) violations of the First Amendment, (ii) excessive force in violation of the Fourth Amendment, (iii) unlawful arrest in violation of the Fourth Amendment, (iv) failures to discipline, and (v) failures to adopt policies or train. Plaintiffs also included claims pursuant to the Texas Tort Claims Act. (ROA.11-ROA.54).

On August 8, 2022, the County Defendant and Sheriff's Office filed a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). (ROA.122-ROA.155). On August 16, 2022, the City Defendant also filed a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). (ROA.196-ROA.227).  On March 20, 2023, the district court issued two orders granting (i) the City Defendant's (ROA.383-ROA.384); and (ii) the County Defendant's and Sheriff's Office's Motions (ROA.385-ROA.387) for dismissal. On March 22, 2023, the district court filed an Amended Rule 54(b) Judgment dismissing Plaintiffs' claims against the Defendants in their entirety with prejudice. (ROA.388).

Plaintiffs filed a Notice of Appeal on April 14, 2023 and appeals the district court's dismissal of Plaintiffs' claims with prejudice. (ROA.391-ROA.392).

Plaintiffs herewith appeal the district court's decision to dismiss Plaintiffs' claims against the City Defendant.

**B.    Statement of Facts**

**1.    The George Floyd Protests of May 2020**

Beginning on May 27, 2020, large-scale peaceful protests occurred throughout the United States in response to the murder of George Floyd in Minneapolis, Minnesota, in remembrance of other unarmed Black people who were killed by police officers under circumstances that led to the officers being charged with murder, and against Police misconduct within the United States. (ROA.17). Such protests occurred throughout most major cities in the United States and were heavily televised. (ROA.17-ROA.18). The protests specifically occurred in Memphis, Los Angeles, St. Louis, Chicago, Atlanta, New York City, Washington D.C., and Detroit, and all involved situations where local law enforcement conducted mass arrests of protestors. *Id.*

Beginning on May 29, 2020, similar protests occurred throughout the City of Dallas. (ROA.17). In response, the City Defendant's law enforcement department, the Dallas Police Department ("DPD") under then-Chief of Police Renee Hall, policed the protests alongside law enforcement officers from the County Defendant. (ROA.18). Due to the nationally televised nationwide protests in the days prior, the policymakers from the City Defendant and the County Defendant were on notice

5

that their officers would be implicated in interactions with protestors involving the likely deprivation of constitutional rights, including rights under the First and Fourth Amendments. *Id.*

> ### 2. Plaintiffs Peacefully Protest in Dallas and are Unconstitutionally Shot at and Violently Detained and Arrested

Such protests throughout Dallas continued into the following day, on May 30 2020. *Id.* Plaintiffs peacefully joined the protests that day. (ROA.17). Ms. Verastique and Ms. Morse marched together with other protestors alongside Reunion Boulevard in the direction of Interstate 35. (ROA.18). Eventually, DPD officers forced the marching protestors into a grassy slope near the interstate. *Id.* As Ms. Verastique and Ms. Morse walked onto the grassy slope, they noticed a Black woman on the ground crying out in pain and being assisted by several other protestors. (ROA.18-ROA.19). As the protestors helped the Black woman to her feet, several DPD officers, including Defendants Rudloff, Barrett, Weltman, and Pillar,[1] stormed the protestors and began unlawfully arresting them without any objective facts indicating that any crime had been committed. (ROA.19).

Ms. Verastique and Ms. Morse were shocked by the DPD officers' conduct and attempted to explain to the officers that the peaceful protestors had not

---

[1] Plaintiffs' claims against the Officer Defendants are pending in the District Court, and the parties are currently engaged in discovery.

committed any crime. (ROA.20). Defendant Rudloff "immediately turned his attention to Verastique and aggressively advanced towards her with a rifle aimed at her chest." *Id.* "Defendant Rudloff subsequently ordered [Ms.] Verastique to stop and place her hands in the air. Verastique immediately complied and remained a lawful peaceful protester. Despite Verastique's compliance, Defendant Rudloff unreasonably shot her at close range for no objective or lawful reason." *Id.* Defendant Rudloff had fired a less-than-lethal pepperball round directly at Ms. Verastique, thereby causing her significant pain, substantial bruising, and difficulty breathing. (ROA.20-23).

After Ms. Verastique collapsed, Defendant Rudloff aimed his weapon at Ms. Morse. (ROA.22). Ms. Morse immediately raised her hands above her head and remained a peaceful protestor. *Id.* Defendant Rudloff then ordered Ms. Morse on the ground and placed Ms. Morse and Ms. Verastique under arrest. *Id.* "Defendant Rudloff failed to provide any probable cause or basis for his commands and there was no attempt to provide medical assistance to [Ms.] Verastique as she yelled out in pain." *Id.*

As this was occurring, Plaintiff Nevills approached Ms. Verastique "hoping to render aid." *Id.* Defendant Barrett fired PepperBalls at Mr. Nevills feet to stop him from rendering aid. Defendant Barrett also used further excessive force by firing pepperball rounds at Mr. Nevills in his stomach. (ROA.23). Defendant Rudloff then

placed Mr. Nevills under arrest without any objective facts indicating a criminal offense occurred. *Id.* During the arrest, Mr. Nevills voluntarily placed his hands behind his back. *Id.* "While Nevills was standing still with his hands behind his back, Defendant Rudloff unreasonably kneed Nevills in the groin area for no apparent reason and without any objective purpose." *Id.* Defendant Rudloff, in coordination with Defendant Weltman, then grabbed Mr. Nevills by the hair and forced him on the ground and placed him in handcuffs. *Id.*

During these arrests, Defendant Pillar expressly criticized Ms. Verastique and Ms. Morse for protesting and acknowledged that he did not see them commit any crime. (ROA.24-ROA.25). Defendant Weltman told Ms. Verastique and Ms. Morris that the DPD "[doesn't] care about peaceful protests." (ROA.25). Defendant Weltman went on to explain that Verastique and Morris were being arrested because an unidentified person threw something at an officer. *Id.* Defendant Weltman admitted that the DPD officers did not know who allegedly threw something and did not identify any of the Plaintiffs as responsible. *Id.* Defendant Weltman stated that everyone in the general area was getting arrested because someone somewhere allegedly threw an object at an officer. (ROA.26-ROA.27). As Defendant Weltman explained this action, "she admitted that the court 'might just drop it,' acknowledging that [the DPD officers] planned to initiate criminal proceedings against the [Plaintiffs] without probable cause and absent a just purpose." (ROA.27).

8

In addition, Defendant Pillar and another DPD officer acknowledged that protestors were being arrested and charged without probable cause. *Id.*

In a nearby area, Plaintiffs Little and Baker were peacefully protesting when DPD officers began using teargas to disperse the protestors. *Id.* "Eventually DPD officers forced [] Baker and Little into a parking garage near Main Street Garden Park and refused to let them leave." *Id.* Shortly afterwards, "DPD Officers [] became frustrated with Baker and Little's repeated requests for their names and badge numbers, slammed Baker to the ground, and beat her; thereby causing significant bodily injuries." (ROA.28). The DPD officers then arrested Ms. Little and Ms. Baker. *Id.*

Following the arrests, all the Plaintiffs besides Ms. Baker were taken to the Dallas County Jail operated by the County Defendant and "detained overnight in unsanitary and dangerous conditions." (ROA.28). While at the Dallas County Jail, detention officers wantonly and maliciously subjected Plaintiffs and other protestors to unconstitutional conditions of confinement in order to punish the pretrial detainees for being part of the protests against police misconduct. (ROA.29). As part of these conditions, detention officers refused to provide Ms. Dobbins any drinking water as she suffered from dehydration because she "should have thought about that before [she] came down here [to protest.]" *Id.* Ms. Verastique was also denied medical attention "for her serious injuries including bruising and exposure to

chemical irritants from the pepper ball chemical weapon" that caused her "substantial pain and continued difficulties breathing." *Id.* "[J]ailers were overheard laughing at Plaintiff's Versatique's medical needs[.]" *Id.* Such deprivations of constitutional rights "at the jail were a common experience that night as there were reports of numerous people bleeding, struggling to breath, bruised, battered, and in dire need of medical attention…the jailers wantonly ignored these needs to punish the detainees and express contempt for them." *Id.*

### 3.    The Charges Against Plaintiffs are Dropped Due to Inconsistent Testimony

Following these events, Plaintiffs were individually charged with criminal offenses. (ROA.30). Plaintiffs subsequently "discovered that [the Dallas District Attorney's Office] and the [DPD Public Integrity Unit] had inconsistent information regarding the basis for Plaintiffs' May 30, 2020 arrests under the DPD's mass arrest procedures." *Id.* Such inconsistency revealed that the arresting DPD officers' arrest reports included wholly different offenses than what the Dallas District Attorney's Office had been notified that the Plaintiffs were arrested for. *See* (ROA.30-ROA.32). Ultimately, "all charges against Plaintiffs were dropped two weeks after their arrests, and thus, ended all of Plaintiffs' criminal proceedings without a conviction." (ROA.31).

The charges initiated against Plaintiffs were dropped because DPD officers instituted criminal charges without any probable cause in order to retaliate against

Plaintiffs for attending the protests. *Id.* Such unlawful mass arrests and malicious charges were a failure of DPD's mass arrest procedures at the time, specifically DPD General Order 609.00. *Id.* DPD General Order 609.00, like all DPD General Orders, was adopted and promulgated by the DPD Chief of Police and set forth internal DPD policy during mass arrest events. (ROA.15; ROA.37; ROA.45). This official policy that dictated DPD officers' actions during mass arrests had the following issues as detailed in Plaintiffs' Complaint:

> (i) A failure "to include a requirement that charges resulting from mass arrests are bound by sufficient probable cause; instead it only requires that arrests be approved by a supervisor from the DPD Patrol Division Investigative Unit[,]" (ROA.31);
>
> (ii) It did "not provide any guidance on restrictions on arrests as it allowed officers to conduct arrests as they saw necessary to 'quell a civil unrest incident[,]' " (ROA.45);
>
> (iii) It "advance[d] [mass] arrests without the necessary finding probable cause; thereby causing unreasonable search and seizures and the institution of criminal charges without probable cause[,]" (ROA.45); and
>
> (iv) It "encourage[d] DPD officers to use arrests as a means to shut down civil protests without any restriction[.] (ROA.45).

In addition to DPD General Order 609.00, Plaintiffs subsequently learned that Defendant Rudloff had been the subject of nineteen department investigations in more than two decades of service. (ROA.33).[2] Rather than discipline or terminate

---

[2] The specific details behind each incident are outlined within Plaintiffs' Original Complaint, and all involved situations implicating the deprivation of constitutional rights. (ROA.33-ROA.35). The documented allegations against Defendant Rudloff

Defendant Rudloff's employment, the City Defendant, through the DPD Chief, rewarded Defendant Rudloff. (ROA.35). Indeed, "Defendant Rudloff was promoted to senior corporal in 2003, then to sergeant in 2007." *Id.* Then-Chief Hall even allowed Defendant Rudloff to supervise law enforcement activities at the George Floyd Protests in May 2020, despite her knowledge of Defendant Rudloff's pattern of misconduct actions which created a substantial likelihood of further constitutional violations. (ROA.36).

The failure to discipline Defendant Rudloff evinced a consistent "pattern of failed discipline[.]" *Id.* "The consequence of this failure to discipline employees was an environment in which Defendant Rudloff, or the other Defendant Officers, felt they could act with impunity towards Plaintiffs and their constitutional rights and allowed for DPD officers to willfully and wantonly deprive Plaintiffs of such rights without any fear of reprisal, discipline, or consequences. (ROA.51). Ultimately, DPD General Order 609.00 and the DPD inadequate disciplinary policy arose from the DPD Chief as the City Defendant's delegated policymaker in the area of law enforcement. (ROA.15; ROA.36; ROA.45; ROA.50-ROA.51).

---

included that he beat a Black man with a flashlight to, as he stated "beat n*****s in the head"; choked a driver for failing to signal before turning; issues with Defendant being "untruthful" regarding his use of force; slamming a man's head in the ground when arresting him for public intoxication; and fatally shooting a carjacking suspect and being 'admonished' for violating DPD policy for using a firearm on which he was not properly trained. *Id.*

## SUMMARY OF THE ARGUMENT

The district court's dismissal of Plaintiffs' claims in a cursory decision against the City Defendant was in error. Without explanation, the district court dismissed with prejudice Plaintiffs' claims, disregarding Plaintiffs' specific valid allegations regarding the City Defendant's delegation of limited policymaking authority to the DPD Chief; the DPD's policies regarding mass arrest at the George Floyd protests in Dallas; and the DPD's documented history of a failure to discipline one of the Officers that caused Plaintiffs' constitutional violations.

First, the district court failed to address Plaintiffs' specific and detailed claims that the City Defendant's City Council, the admitted official policymaker for the City of Dallas, both expressly and impliedly delegated authority to the DPD Chief to institute policies and procedures over the Dallas police department. The district court did not address these valid claims at all, and instead summarily stated that City Council is the official policymaker, and that Plaintiffs did not allege facts that "would change this determination." Either the district court confused the argument, ignored the governing law, or it ignored Plaintiffs allegations. Whichever it is, Plaintiffs agree that City Council is the official policymaker, which by definition gives City Council the power to delegate specific authority while retaining its official policymaker status. Plaintiffs pleaded this in detail, explaining how the City Council

delegated policymaking authority over the DPD to the DPD Chief. The district court was in error in disregarding that Plaintiffs had plausibly pleaded that the DPD Chief had delegated policymaking authority over the DPD, especially given the liberal pleading standard regarding the identified policymaker in § 1983 claims.

Second, the district court erred in ignoring Plaintiffs' allegations that the written policies identified by Plaintiffs were unconstitutional on their face. Instead of addressing this allegation, the district court instead required Plaintiffs to specifically plead that the City Defendant was "deliberately indifferent." Plaintiffs need not show that the City Defendant was deliberately indifferent if the policy of arresting citizens without probable cause during protests in violation of the First and Fourth Amendment is unconstitutional. Failing to analyze whether the Plaintiffs had pleaded that City Defendant's written policy of arresting protestors without probable cause during protests was plausibly unconstitutional is a reversible error.

Finally, the district court plainly ignored Plaintiffs' detailed allegations that one of the Officers that committed multiple constitutional violations against Plaintiffs was a known aggressor, with multiple complaints, and yet was never terminated or even adequately disciplined, and was instead given authority over other officers in carrying out DPD's policies during the protest in question. Plaintiffs detailed over eighteen (18) complaints against Defendant Rudloff, including that he had previously targeted Black citizens, calling them the n-word, and not only using

excessive force, but then being "untruthful" about it. The district court thus did not consider whether such specific and detailed allegations plausibly indicated the existence of an inadequate disciplinary policy to support Plaintiffs' failure-to-discipline claim. The district court's ignoring Plaintiffs' allegations regarding this claim is reversible error.

Plaintiffs therefore respectfully request that the Court reverse the dismissal of Plaintiffs' claims against the City Defendant and remand to the district court with the instructions to properly address Plaintiffs' pleaded allegations.

## ARGUMENT

### A. Applicable Legal Standards

#### 1.   This Court's Standard of Review

The district court's dismissal of Plaintiffs' claims pursuant to 12(b)(6) is reviewed *de novo*, and this Court must accept "all well-pleaded facts as true and review[] those facts in the light most favorable to the plaintiffs." *Dalfrey v. Boss Hoss Cycles, Inc.,* 456 Fed. Appx. 329, 331 (5th Cir. 2011); *Richardson v. Axion Logistics, L.L.C.,* 780 F.3d 304, 304-305 (5th Cir. 2015) (quoting *Montoya v. FedEx Ground Package Sys., Inc.,* 614 F.3d 145, 146 (5th Cir. 2010). A complaint must only "contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." *City of Clinton v. Pilgrim's Pride Corp.,* 632 F.3d 148, 152 (5th Cir. 2010).

As pertaining specifically to § 1983 claims, the jurisprudence is clear that there is no restrictive theory of the pleadings doctrine. *See e.g., Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S.163, 164 (1993)) (holding that plaintiffs seeking damages for violations of constitutional rights are not subject to a heightened pleading rule).  Plaintiffs "do not need to present [their] best case or even a particularly *good* case, only to state a plausible case … to survive this facial challenge." *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (5th Cir. 2014).

### 2.      Applicable Standard for Sufficiently Pleading the Delegated Policymaker Pursuant to § 1983

Importantly, "[C]ourts should not grant motions to dismiss for [the] fail[ure] to plead the specific identity of the policymaker." *Carmona v. City of Dallas*, 2020 WL 2812859, at *5 (N.D. Tex. May 28, 2020) (emphasis added) (citing *City of Shelby,* 574 U.S. at 11-12). Rather, a § 1983 plaintiff need only "plead sufficient facts to allow the court to reasonably infer that the [policymaker] either adopted a policy that caused [the plaintiff's] injury or delegated to a subordinate officer the authority to adopt such a policy." *Hughes v. City of Dallas*, 2020 WL 4670659, at *4 (N.D. Tex. Aug. 11, 2020). Indeed, "the Supreme Court has repeatedly

emphasized that the identity of the policymaker is a question of law, not fact" and therefore, courts should not dismiss § 1983 claims for failing to allege the identity of a specific policymaker in the pleadings. *See id.*; *see also Pena v. City of Rio Grande City,* 879 F.3d 613, 622-623 (5th Cir. 2018) (stating that the identity of the policymaker is a legal question and therefore courts should not grant dismissal for failing to identify in the pleadings).

### 3. Applicable Legal Standard for Municipal Liability Against the City Defendant

To sufficiently allege claims for municipal liability against the City Defendant, Plaintiffs must have sufficiently alleged (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom. *Valle v. City of Houston,* 613 F.3d 536, 541-542 (5th Cir. 2010); *see e.g. Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978) (holding that a municipality's policies that ignore well-settled interpretations of constitutional rights are facially unconstitutional).

### 4. Applicable Standard Regarding Plaintiffs' Failure to Discipline Claims Pursuant to § 1983

Establishing municipal liability for a municipality's failure-to-discipline policy can be established by a systemic inattention to complaints of misconduct for an officer and toothless investigations in response to incidents of misconduct. *Vess*

*v. City of Dallas*, 2022 WL 2277504, at *11 (N.D. Tex. June 23, 2022) ("To support a failure-to-discipline policy, the Fifth Circuit has suggested that there be an indication of 'systematic inattention' to complaints of misconduct and of 'a purely formalistic investigation' in response to incidents of misconduct.") (citing *Piotrowski v. City of Houston,* 237 F.3d 567, 579 (5th Cir. 2001)). In this context, there is "no rigid rule regarding numerosity to prove a widespread pattern [or systemic inattention] of [prior] unconstitutional acts." *Jackson v. Valdez*, 852 Fed. Appx. 129, 136 (5th Cir. 2021) (per curiam), *cert. denied*, —— U.S. ——, 142 S.Ct. 863, 211 (2022). However, if a plaintiff pleads specific and detailed allegations of prior acts, then there is no for more numerous allegations as specific allegations provide the context necessary to make a plaintiff's claims of a custom or policy plausible. *See Vess,* 2022 WL 277504 at *11.

### B.    The District Court Wrongfully Ignored Plaintiffs' Specifically Pleaded Allegations that the DPD Chief was the Delegated Policymaker for the Policies and Practices of the DPD

The district court erroneously confuses the legal argument raised by Plaintiffs regarding the identification of the policymaker for internal DPD procedure. The district court specifically found that "Plaintiffs' allegations that the Chief of the Dallas Police department is the city policymaker have already been rejected by precedent in this Court[.]" (ROA.383). However, Plaintiffs did not allege that the

DPD Chief was the <u>official</u> city policymaker for all city functions. Rather, Plaintiffs expressly argued that the DPD Chief is only "the <u>delegated</u> policymaker of the City Defendant for the policies, customs, practices, and training of the DPD and DPD officers[.]" (ROA.312). The district court erroneously confused "official" and "delegated" policymaker, and therefore failed to evaluate whether the DPD Chief was the delegated policymaker for internal DPD procedure in the area of law enforcement.

A proper identification of the policymaker relies on whether "state and local positive law, as well as 'custom or usage' having the force of law," provide an official with "the power to make official policy on a particular issue[.]" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). But this Circuit has required additional analysis in identifying whether an the official policymaker has delegated policymaking authority for specific policies and procedures in a particular area of governance. Specifically, this Circuit has expressly stated that a city's policymakers may "delegate policymaking authority (1) by express statement or formal action or (2) 'it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role.'" *Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161, 167 (5th Cir. 2010) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)). In this context, a delegated policymaker "decide[s] the goals for a particular city

function and devise[s] the means of achieving those goals." *Id.* (quoting *Bennett*, 728 F.2d at 769).

To determine whether policymaking authority has been delegated, the district court was required to review (1) "express" delegation through the express statements or formal actions of the official policymaker; and/or (2) "implied" delegation through the conduct or practice of the official policymaker. *See Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) ("Our inquiry does not end where state law does not establish the relevant actor as a final policymaker, however. <u>A municipal employee may also possess final policymaking authority where the final policymaker has delegated that authority, either expressly or impliedly</u>.") (emphasis added).

This analysis begins by looking at the body of law governing the City Defendant. For the City Defendant, as a home-rule municipality, the relevant state and local positive law are the Texas Constitution, state statues, the City's Defendant's Charter, and the City Defendant's Code of Ordinances. *See Zarnow*, 614 F.3d at 167 (establishing that a Texas home-rule municipality, has "its powers limited only by the Texas Constitution, state statutes, and the City's Charter[,]" and including common practices or code established by a city's policymaker); *see also* Tex. Local Gov't Code § 26.041(3) (A home-rule municipality may "prescribe the qualifications, duties, and tenure of office for officers.").

Under such law, the City Defendant is a local municipality empowered and incorporated as a home-rule municipality under the Texas Constitution and the Texas Local Government Code. *See* CHARTER OF THE CITY OF DALLAS, TEX. CH. II § 2[3] ("The [City Defendant] shall have and exercise all powers conferred upon cities by what is known as the Home Rule Amendment to the Constitution of the State of Texas and the Enabling Act relative thereto[.]"); *see also* TEX. CONST. art. XI, § 5; TEX. LOCAL GOV'T CODE § 9, 26; (ROA.15). As a home-rule municipality, the City Defendant operates under its municipal charter: the Charter of the City of Dallas, Texas ("the Charter"). *ESI/Employee Solutions, L.P. v. City of Dallas,* 531 F.Supp.3d 1181, 1191 (E.D. Tex. 2021) ("Home-rule cities are those operating under a municipal charter as provided for in the Texas Constitution.") (quoting *Barnett v. City of Plainview*, 848 S.W.2d 334, 337 (Tex. App.—Amarillo 1993, no pet.); TEX. CONST. art. XI, § 5.).

The City Defendant also has the power to establish and govern its own police force. *Johnson v. Rosenberg Police Dep't*, 2019 WL 3892331, at *2 (S.D. Tex. Aug. 19, 2019) ("As a home-rule municipality, [a home-rule city] has the authority to

---

[3] Available at https://codelibrary.amlegal.com/codes/dallas/latest/dallas_tx/0-0-0-49893. Plaintiffs ask that this Court take judicial notice of the publicly available terms of the City Defendant's Charter and the City Defendant's Code of Ordinances. *See Overton v. City of Austin,* 748 F.3d 941, 954 fn.15 (5th Cir. 1984) (affirming that the Fifth Circuit can take judicial notice of provisions of city charters within the state of Texas) (collecting cases).

establish its own police force.") (citing TEX. LOCAL GOV'T CODE § 341.003). Under the City Defendant's Charter, the City Defendant funds and governs the DPD through the direction of the Dallas Police Department Chief of Police ("DPD Chief"); and delegates that the DPD Chief "shall have immediate direction and control of the [DPD]…and shall promulgate all orders, rules, and regulations for government of the [DPD]." CHARTER OF THE CITY OF DALLAS, TEX. Ch. XII § 1; 2(1).

In addition, under the Charter, the City Defendant's City Council (hereafter "City Council") possesses the power, "[e]xcept as otherwise provided by [City Defendant's Charter]," to establish the "official actions [of the City Defendant] by written ordinances, resolutions, or oral motions." CHARTER OF THE CITY OF DALLAS, TEX. CH. XVIII § 1. The written ordinances ("Dallas City Code") operate as the official policies and procedures of the City of Dallas, expressly "ORDAINED" by the City Council. *See* DALLAS CITY CODE, CH. 1; *see also* CHARTER OF THE CITY OF DALLAS, TEX. at CH. XVIII § 2. As such, the provisions of the Dallas City Code are the express statements or formal actions of the City Council. Therefore, the provisions of the Dallas City Code operate as a legal expression of the City Council's express delegation within the delegated policymaker framework.[4]

---

[4] There is no dispute among the parties that the City Council exists as the City Defendant's final policymaker.

The interpretation of the Dallas City Code for this purpose is controlled by the same construction and interpretation rules that apply to Texas state statutes. *See Mills v Brown*, 316 S.W.2d 720, 723 (Tex. 1994). Such rules dictate that "[i]f language in a statute is unambiguous, this court must seek the intent of the legislature as found in the plain and common meaning of the words and terms used." *Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 (Tex. 1994) (collecting cases). In addition, "[i]n applying the plain and common meaning of the language in a statute, courts may not by implication enlarge the meaning of any word in the statute beyond its ordinary meaning; such implication is inappropriate when legislative intent may be gathered from a reasonable interpretation of the statute as it is written." *Id.* (citing *Monsanto Co. v. Cornerstones Municipal Util. Dist.*, 865 S.W.2d 937, 939 (Tex.1993)). "'Further, if a statute is unambiguous, rules of construction or other extrinsic aids cannot be used to create ambiguity.'" *Id.* Therefore, interpreting such provisions of the Dallas City Code for the purpose of identifying express delegation requires interpreting the plain and common meaning of the provisions.

Guided by these interpretation rules and as a matter of law, it becomes evident that the City Council has expressly delegated policymaking authority to the DPD Chief in area of law enforcement. Specifically, the Dallas City Code states that "[i]n the prevention and suppression of crime and the arrest of offenders, [the Chief of Police] shall have the same powers as the sheriff of a county under the laws of the

state." DALLAS CITY CODE, CH. 37, ART. II § 37-23. In addition, in a breach of the peace, the Dallas City Code states that "[i]n the prevention and suppression of crime and the arrest of offenders, [the Chief of Police] shall have and execute like power, jurisdiction, and authority as the sheriff of the county under the laws of the state." DALLAS CITY CODE, CH. 37, ART. II § 37-24.

As such, under the plain and common meaning of these provisions, the City Council has expressly delegated the DPD Chief with whatever powers and authority a Texas county sheriff possesses in the area of law enforcement. Notably, it well-established that a Texas county sheriff's powers include operating as the final policymaker for a Texas county in the area of law enforcement. *See Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 448 (5th Cir. 2019) (*"'*In Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected.'" (quoting *Turner v. Upton County, Tex.* 915 F.2d 133, 136 (5th Cir. 1990)). Therefore, as a matter of law, under the Dallas City Code, as ordained by the City Council, the DPD Chief is the expressly delegated "final policymaker in the area of law enforcement."

But the City Council has not only expressly delegated such policymaking authority. Accepting Plaintiffs' allegations as true, the City Council has also impliedly delegated such authority through its conduct or practice by the widespread

acceptance that the DPD Chief sets internal police procedure through the use of "General Orders," and by the pleaded facts that the City Council failed to abrogate the DPD Chief's law enforcement authority when creating the Office of Community Police Oversight.  (ROA.15; ROA.37); *see also Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 751 (5th Cir. 2019) (affirming that a plaintiff can establish an official has implied delegated policymaking authority "as long as they plead sufficient facts to allow the court to reasonably infer that the [policymaker]… delegated to a subordinate officer the authority to adopt such a policy.") (emphasis added).

This Circuit, in *Zarnow v. City of Wichita Falls, Tex.*, has explicitly evaluated this very same legal issue. Specifically, *Zarnow* answered whether the existence of a city police department's General Orders created by a chief of police were sufficient to establish that the chief of police held implied delegated policymaking authority for a Texas home-rule city. *See Zarnow*, 614 F.3d at 167-68.  In order to answer this question, the Fifth Circuit interpreted § 1983 municipal claims under Texas law to determine if a chief of a city police department was an official policymaker for the city under the "Texas Constitution, state statutes, and the City's Charter." *Id*. The home-rule city defendant asserted that their city charter established oversight by their city manager and their city council over the police department, and thus the chief of police was not a final, official policymaker. *Id.* This exact same argument

was advanced in this matter by the City Defendant in the District Court. *See* (ROA.209-ROA.211; ROA.375-ROA.377).

However, the panel in *Zarnow* rejected this argument based on a specific review of the city's charter and a review of the nature of the city council's/city manager's oversight of the police department. *Id.* The panel ultimately held that, absent evidence of substantial authoritative involvement by a home-rule city council on internal police procedures, a home-rule municipality's city council does not engage in direct oversight to indicate an absence of implied delegated policymaking authority. Even "evidence that the City Council periodically authorized the creation of various police task forces" did not abrogate the police chief's implied policymaking authority because such "resolutions have little to do with police policy [and] there is no evidence that the City Council has ever commented authoritatively on the internal procedures of the [police] department." *Id.* Therefore, in such situations a "City impliedly delegate[s] its policymaking authority to the chief of police." *Id.* at 167. As such, this Circuit held that"

> "General Orders promulgated by the police chief sufficed to be the 'more' that is needed to prove policymaking authority in these circumstances. On this evidence, the chief of police is the sole official responsible for internal police policy. Others have only marginal involvement with the internal procedures of the police force." *Id.* at 168 (emphasis added).

The holding in *Zarnow* holds considerable weight in this matter because the City Defendant's Charter is almost an exact replica of the charter evaluated in *Zarnow*:

> *Compare* "The police department shall be under the direction of a chief of police, who shall be appointed by the city manager and who, <u>subject to the supervision of the city manager</u> <u>and to such rules regulations and orders prescribed by the city manager not inconsistent with the City Charter and ordinances</u>, shall have immediate control and direction of such department." (citing Charter of The City of Wichita Falls, Tex. Art. XII) (emphasis added);

> *with* "The chief of police shall have immediate direction and control of the police department, <u>subject to the supervision of the city manager</u>, <u>and also subject to such rules, regulations, and orders as the city manager may prescribe, not inconsistent with the ordinances of the city</u>, and shall promulgate all orders, rules, and regulations for government of the police force. Charter of The City of Dallas, Tex. Ch. XII § 2(1) (emphasis added).

Therefore, the holding reached in *Zarnow* is similarly inescapable here given these similarities — as then-Chief Hall operated the DPD through the adoption and promulgation of "General Orders." *See* (ROA.15; ROA.37; ROA.45). The district court wrongfully failed to explain why it departed from this controlling precedent.

It has been also repeatedly affirmed throughout courts in this Circuit that pleadings involving a Texas police chief's adoption and promulgation of "General Orders" are sufficient to establish a chief as the delegated policymaking authority in the area of law enforcement for a home-rule municipality. *See e.g., Hobart v. Estrada*, 582 F. App'x 348, 356 (5th Cir. 2014) (holding that policies created by a police chief in General Orders are the written guidelines of the police department

containing all polices, thereby granting a police chief delegated policymaking authority); *Robinson v. City of Garland*, 2016 WL 7396048, at \*9 (N.D. Tex. Aug. 17, 2016) (holding that a city charter subjected a police chief the oversight of a city Manager and city council, but that a police chief's ability to enter General Orders in the charter and to set police policy were sufficient to establish the chief as the delegated municipal policymaker for the city's police department) (citing *Zarnow*, 614 F.3d. at 166); *Villegas v. City of El Paso*, 2020 WL 981878, at \*16 (W.D. Tex. Feb. 28, 2020) (holding that a police chief was an official policymaker for a city because a plaintiff pleaded that constitutional violations were the "product of policies implemented by [the Chief of Police]."); *Backe v. City of Galveston, Tex.*, 2 F.Supp.3d 988, 999-1000 (S.D. Tex. 2014) (holding that a city's Chief of Police was properly considered a municipal policymaker through the development of "policies and directives authored by current and former Chiefs of Police[,]" despite "the City Council or City Manager [possessing] some theoretical ability to overrule or constrain the polices enacted by the Chief of Police[.]"); *Mote v. Walthall*, 2017 WL 2651705, at\*11-12 (E.D. Tex. June 20, 2017) (holding that a complaint sufficiently pleaded a city impliedly delegated its policymaking authority to a police chief for the police department because the complaint pleaded that the police chief authorized the relevant actions and "approved General Order[s]").

As a result, the presence of "General Orders" or policies authored by current and former chiefs of police for a home-rule city establish delegation for "<u>Texas police chiefs [as] final policymakers for their municipalities</u>." *Garza v. City of Donna*, 922 F.3d 626, (5th Cir. 2019) (emphasis added). Plaintiffs sufficiently pleaded the existence of the DPD General orders promulgated by then-Chief Hall numerous times.[5] The district court thus erred in finding that the DPD Chief was not the impliedly delegated municipal policymaker for the City Defendant regarding all deprivations of their constitutional rights related to the Dallas Police actions during the George Floyd protests.

\*   \*   \*

Therefore, Plaintiffs sufficiently pleaded that the DPD Chief was the delegated municipal policymaker for the City Defendant regarding the policies and procedures governing the DPD.  The district court failed to do any of this analysis and wrongfully ceased its analysis upon the finding that only the City Council is the official policymaker for the City Defendant. But that is not the issue here, as Plaintiffs agree that the City Council is the official policymaker for all City policies and procedures. However, if the district court had undertaken the proper analysis, it would have found that: (i) as a matter of law, the DPD Chief was the City Defendant's expressly delegated policymaker in the area of law enforcement; and

---

[5] *See supra.* at p. 13.

(ii) Plaintiffs adequately pleaded that the DPD Chief was the City Defendant's delegated policymaker by implied delegation in the area of law enforcement during the relevant time. The "official" policymaker for the City Defendant, the City Council, has expressly and impliedly delegated the DPD Chief policymaking authority in this limited area. The district court's holding should thus be reversed and remanded for further analysis as to whether the DPD Chief was the delegated policymaker regarding the specific policies that caused Plaintiffs' constitutional violations and harm.

### C.    The District Court Erred in Disregarding Plaintiffs' Argument that the City Defendant's Mass Arrest Policy was Unconstitutional on its Face Thus Sufficiently Alleging *Monell* Liability

The district court erred in ignoring Plaintiffs' allegations that the written policies identified in Plaintiffs' Complaint were unconstitutional on their face. (ROA.383-384). Rather, the district court only analyzed whether Plaintiffs adequately pleaded that the City Defendant was deliberately indifferent to Plaintiffs' constitutional rights. (ROA.384) The district court found that "the Complaint fails to state a *Monell* claim [ ]against Defendant City of Dallas because it fails to allege facts that amount to <u>deliberate indifference</u> in any alleged unconstitutional policy, practice, or procedure that was a moving force behind the alleged constitutional violations[.]") (ROA.384). (emphasis added).

30

However, Plaintiffs need not prove that Defendant acted with deliberate indifference when the allegation is that an official policy or practice was unconstitutional on its face. *See Covington v. City of Madisonville, Tex.*, 812 Fed.Appx. 219, 225 (5th Cir. 2020) ("'Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy but was also aware that a constitutional violation [would] most likely occur.' ") (quoting *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003)) (annotation in original); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 579 & fn.22 (5th Cir. 2001) ("[A]n unconstitutional official policy renders a municipality culpable under § 1983," without any need for deliberate indifference). In this context, "[a]on official policy … exists in the form of written policy statement, ordinances, or regulations[.]" *Id.*

Indeed, this Circuit has previously admonished a district court for failing to consider whether a policy was facially unconstitutional represented a fact issue. *See Maddux v. Officer One*, 90 Fed.Appx. 754, 771 (5th Cir. 2004) (reversing and remanding a judgment of a matter of law because the district court failed to credit a plaintiff's argument that a facially unconstitutional policy established municipal liability). As such, the district court in this matter committed reversible error in failing to consider whether the pleaded facts plausibly established that such policies were facially unconstitutional. *See id.* at 771-772 (recognizing that the issue of

whether a written policy is facially unconstitutional is a fact issue as a "written policy provided a legally sufficient <u>evidentiary</u> basis from which a reasonable jury could have found" that a city's official policies were the moving force behind a the deprivation of a plaintiff's constitutional rights); *see also Sanchez v. Gomez*, 2020 WL 1036046, at \*11 (W.D. Tex. Mar. 3, 2020) ("The Court is not asked with constructing the policy. The Court must instead assess these provisions as evidence of a written policy that supports one of Plaintiffs' claims for relief.") (citing *Maddux*, 90 Fed.Appx. at 771-772).

The unconstitutional written policy specifically identified by Plaintiffs was DPD General Order 609.00. (ROA.31). Plaintiffs' Complaint stated the following:

> The widespread institution of charges without probable cause during DPD's mass arrests was a failure of DPD's mass arrest procedures at the time, specifically DPD General Order 609.00. DPD General Order 609.00 fails to include a requirement that charges resulting from mass arrests are bound by sufficient probable cause; instead it only requires that arrests be approved by a supervisor from the DPD Patrol Division Investigative Unit…Further, DPD General Order 609.00 did not provide any guidance on restrictions on arrests as it allowed officers to conduct arrests as they saw necessary to 'quell a civil unrest incident.' As a result, [the City Defendant's] official mass arrest policies advance[d] arrests without the necessary finding probable cause; thereby causing unreasonable search and seizures and the institution of criminal charges without probable cause. The official mass arrest policies also encourage[d] DPD officers to use arrests as a means to shut down civil protests without any restriction[.] (ROA.31; ROA.45).

Plaintiffs stated that DPD officers relied on DPD General Order 609.00 when they arrested Plaintiffs simply for being in an area involving other protestors, and thus

served as the moving force behind the deprivation of Plaintiffs' constitutional rights. *See* (ROA.25-ROA.27; ROA.46). Plaintiffs alleged that "Defendants Rudloff, Barrett, Weltman, Pillar and Hoffman acted on Defendant City of Dallas' facially unconstitutional policies through arresting Plaintiffs without probable cause and instituting criminal charges without probable cause that were ultimately dismissed." (*Id.*).

Such pleaded facts and the reasonable inferences that arise from them make it at least plausible that DPD General Order 609.00 was unconstitutional on its face, because as written it does not consider whether specific facts particularized to the person indicate that an offense has been committed to effectuate an arrest during a mass arrest event, as is unarguably required by law. *See Johnson v. Thibodaux City*, 887 F.3d 726, 735 (5th Cir. 2018) (holding that without a crime there was no probable cause to arrest); *see also Evett v. DETNFF,* 330 F.3d 681, 688 (5th Cir. 2003) ("Probable cause exists when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed[,]" and the facts "must be particularized to the arrestee.") (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). DPD General Order 609.00 also unconstitutionally directs an officer to use a person's mere proximity to other protesters as the impetus behind an arrest. *See Ybarra*, 444 U.S. at 86 ("[A]

person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . ."); *Barham v. Ramsey*, 338 F. Supp. 2d 48, 58 (D.D.C. 2004) (police chief's "belief that *some* protesters *may* have earlier broken laws does not justify a mass arrest of an entire group of lawful protesters") (emphasis in original). In addition, General Order 609.00 is unconstitutional on its face as it directs DPD officers to engage in retaliatory arrests in violation of the First Amendment simply to quell civil unrest. *See Keenan v. Tejda* 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities.") (citation omitted); *see also Colson v. Groman*, 174 F.3d 498, 509 (5th Cir. 1999) ("The Supreme Court has asserted that imposing penalties for speech, belief, and association chills the exercise of First Amendment freedoms[.]") (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

Plaintiffs' allegations conclusively established that the delegated policymaker, then-Chief Hall, adopted and promulgated this mass arrest policy. (ROA.15; ROA.37; ROA.45). It is further plausible, as Plaintiffs alleged, that the relevant DPD officers followed this General Order during the George Floyd protests. This is especially true because the City Defendant's Charter expressly states that the DPD Chief has the sole authority to "discipline any of the officers or employees who

may be under the chief's jurisdiction and control…for failure[s] to obey orders given by the proper authority, or the orders, rules, and regulations promulgated by the chief of police." CHARTER OF THE CITY OF DALLAS, Tex. Ch. XII § 4; *Jauch v. Choctaw Cty.*, 874 F.3d 425, 435 (5th Cir. 2017) (explaining that causation is clear when an employee acts at the direction of a municipal policy). It was therefore reversible error for the district court to ignore Plaintiffs' allegations was at least plausible that a facially unconstitutional written official policy adopted and promulgated by a delegated policymaker was the moving force behind the unconstitutional violations that caused Plaintiffs' harm. *See Piotrowski*, 237 F.3d at 579 (affirming that a facially unconstitutional policy attributable to an official with delegated policy-making authority can establish municipal liability).

### D.     The District Court Erroneously Ignored Plaintiffs' Argument that the City's Inadequate Disciplinary Policy is Sufficient to Allege Municipal Liability at the Dismissal Stage

The district court also erroneously ignored Plaintiffs' allegations that the City Defendant was liable for an inadequate disciplinary policy. In fact, the district court completely overlooked that Plaintiffs pleaded that the DPD, under past and present Chiefs of Police, failed to discipline Defendant Rudloff for eighteen (18) incidents involving the deprivation of constitutional rights. (ROA.33-ROA.35). As such, the district court wrongfully failed to evaluate the pleadings that provided highly specific information detailing each of Defendant Rudolff's excessive use of force,

unconstitutional stops and seizures, and malicious treatment of members of the public; and that the DPD promoted Defendant Rudloff rather than terminate him or even effectively discipline him for his actions. *Id.* Indeed, Plaintiffs pleaded that "[c]onsistent with this pattern of failed discipline, Chief Hall allowed Defendant Rudloff to supervise law enforcement activities at the George Floyd Protests in May 2020." (ROA.36). Nor did the district court analyze whether the DPD's failure to hold Defendant Rudloff accountable after the protests was further evidence supporting Plaintiffs' failure-to-discipline claim. *Id.* Plaintiff specifically pleaded that "DPD closed a criminal investigation into Defendant Rudloff's use of excessive force against Verastique without a public statement or any notice given to the Dallas Office of Community Police Oversight." (ROA.36). In addition, Plaintiffs established that the DPD failed to discipline any employees responsible for constitutional violations that occurred during the George Floyd protests. (ROA.51).

Plaintiffs therefore pleaded that it was at least plausible that the City Defendant has a failure-to-discipline or terminate policy arising from the DPD Chief, as the delegated policymaker,[6] that protects DPD officers that violate the public's constitutional rights based on the numerous specific incidents pleaded where the

---

[6] Under the City Charter, the DPD Chief has full authority to establish internal disciplinary policies and procedures for DPD officers. *See* Charter of The City of Dallas, Tex. Ch. XII § 4 ("The Chief of Police shall have the right to discipline any of the officers or employees who may be under the chief's jurisdiction and control…).

DPD failed to discipline constitutional violations and the continued failure to discipline any officers based on their conduct during the protests. *See Vess*, 2022 WL 2277504, at *12 (holding that specific allegations regarding a history of failure-to-discipline were sufficient to establish a policy of "protection for previously disciplined personnel by refusing to terminate or separate from employment individuals unfit to serve as members of the Dallas Fire Department despite good cause for termination and the risk these individuals pose to the public."). The policy combined with then-Chief Hall's actions to empower Defendant Rudloff to supervise operations and other DPD officers at the May 30, 2020 protests allowed Defendant Rudloff and other DPD officers to engage in misconduct, thereby acting as the moving force behind Plaintiffs' constitutional injuries caused by the Officer Defendants and other DPD officers. *Vess*, 2022 WL 2277504, *13 (finding for plausible causation because "[n]umerous courts have held that a policy of lack of discipline and protection plausibly emboldens officers to engage in misconduct.") (collecting cases); *Ramirez v. Escajeda*, 2021 WL 3713064, at *48 (W.D. Tex. Aug. 20, 2021) ("[A] reasonable jury could infer that [a police officer] may have deemed that using force was an 'easy fix' to complex situations like the one he encountered…, because [the chief of police] failed to reinforce the right behavior through discipline.").

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully request that this Court reverse the District Court's dismissal of Plaintiffs' claims and remand to the District Court for further proceedings consistent with this Court's order.

<div style="margin-left:40%;">

Respectfully Submitted,

*/s/ David W. Henderson*

David Henderson

Jay D. Ellwanger

Jennifer Jones Despins

**ELLWANGER HENDERSON LLLP**

400 S. Zang Blvd., Ste. 600

Dallas, Texas 75208

Phone: (737) 202-2986

dhenderson@equalrights.law

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2023, a true and correct copy of the foregoing Brief for Plaintiffs-Appellants was served via electronic filing with the Clerk of Court and all registered ECF users.

Dated: June 12, 2023                    */s/ David W. Henderson*
                                         David W. Henderson

## **CERTIFICATE OF COMPLIANCE**

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word. Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 8,597 words.

Respectfully Submitted,

*/s/ David W. Henderson*
David W. Henderson